`

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MALINDA DAVIS | ) | Case No. 1:17-cv-1452 |
| *on behalf of* C.D., | ) | |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **<u>MEMORANDUM OF OPINION</u>** |
| SECURITY, | ) | **<u>AND ORDER</u>** |
| | ) | |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Malinda Davis, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental social security income ("SSI") benefits on behalf of her minor child, C.D., under Title XVI of the Social Security Act. The parties consented to my jurisdiction. ECF Doc. 14.

Because substantial evidence supported the ALJ's decision and he applied the correct legal standards, the final decision of the Commissioner must be AFFIRMED.

## II.     Procedural History

Davis applied for SSI on behalf of her minor child, C.D., on June 26, 2014. (Tr. 171-176). The Social Security Administration denied Davis's application initially and upon reconsideration. (Tr. 97-107; 109-119) Administrative Law Judge ("ALJ") George D. Roscoe heard the case on February 3, 2016 and denied the claim on March 14, 2016. (Tr. 10-28). The Appeals Council declined review of that decision, rendering the ALJ's decision the final decision

of the Commissioner.  (Tr. 1-5)  Davis instituted this action to challenge the Commissioner's

conclusion that her child was not disabled.  ECF Doc. 1.

### III.     Standard for Child Disability Claims

The standard for evaluating a child disability claim differs from that used for an adult's

claim.  42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F.

App'x 146, 147 (6th Cir. 2002).  A child is considered disabled if he has a "medically

determinable physical or mental impairment that results in marked and severe functional

limitations and can be expected to result in death or has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).  To determine

whether a child is disabled, the regulations prescribe a three-step sequential evaluation process.

20 C.F.R. § 416.924(a).  At Step One, a child must have engaged in "substantial gainful

activity."  20 C.F.R. § 416.924(b).  At Step Two, a child must be found to suffer from a "severe

impairment."  20 C.F.R. § 416.924(c).  At Step Three, disability will be found if a child has an

impairment, or combination of impairments, that meets, medically equals, or functionally equals

an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the

Commissioner must assess the functional limitations caused by the impairment by evaluating

how a child functions in six domains: (1) acquiring and using information; (2) attending and

completing tasks; (3) interacting and relating with others; (4) moving about and manipulating

objects; (5) caring for [oneself]; and (6) health and physical well-being.  20 C.F.R. §

416.926a(b)(1)(i)-(vi).  If a child's impairment results in "marked" limitations[1] in two domains,

---

[1] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate,
sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is "more than
moderate" but "less than extreme." Id. "It is the equivalent of the functioning we would expect to find on

or an "extreme" limitation[2] in one domain, the impairments functionally equal the Listings and the child will be found disabled. 20 C.F.R. § 416.926a(d).

## IV.     The ALJ's Decision

On March 14, 2016, the ALJ decided:

1.  C.D. was born on June 1, 2005.  Therefore, he was a preschooler on June 20, 2014, the date the application was filed, and is currently a school-age child. (Tr. 14)

2.  C.D. had not engaged in substantial activity since June 20, 2014, the application date.  (Tr. 14)

3.  C.D. had the following severe impairments: oppositional defiant disorder; attention deficit hyperactivity disorder; depressive disorder; post traumatic stress disorder; asthma; and headaches.  (Tr. 14)

4.  C.D. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 14-15)

5.  C.D. did not have an impairment or combination of impairments that functionally equaled the severity of one of the listed impairments.  (Tr. 15)

In determining functional equivalence, the ALJ individually evaluated C.D.'s abilities under all six domains of functioning and made the following findings:

A.  Acquiring and using information:  less than marked limitation
B.  Attending and completing tasks:  less than marked limitation
C.  Interacting and relating with others:  marked limitation
D.  Moving about and manipulating objects:  no limitation
E.  Caring for yourself (Self-care):  less than marked limitation
F.  Health and physical well-being:  less than marked limitation

(Tr. 24-31)  The ALJ determined that C.D. had not been under a disability since June 20, 2014, the date the application was filed through the date of his decision.  (Tr. 32)

---

standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id.

[2] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked."  Id. "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id.

V.    **Relevant Evidence**

A.    **School Evidence**

C.D. was born on June 1, 2005 and was ten years old, a school-age child, at the time of his hearing.  (Tr. 171, 11-14)

In the 2013-2014 school year, C.D. was suspended from school several times for repeated disruptive behavior, failure to follow directives, and fighting.  (Tr. 208, 212-213, 218-219)  His records show behavior incidents of leaving the classroom, talking back to teachers, attempting theft of school or private property, and attempting to cause physical harm to a school employee or other person.  (Tr. 232, 349, 421, 422)

In the fall of 2013, C.D. performed at the limited level and did not meet standards for reading at the third grade level.  (Tr. 204-205)  In the spring of 2014, C.D. took the third grade Ohio Reading and Math Achievement Assessments tests and performed at the limited level for reading – not meeting standards for grade three reading.  He performed at the proficient level for math and met the standards for third grade math. (Tr. 344)

An Individualized Education Program ("IEP") was implemented in Fall 2014 to address C.D.'s deficiencies in reading and off-task behavior that impeded his learning.  C.D. was on task 37% of the time which caused considerable difficulty in the classroom setting.  (Tr. 379-390) WISC-IV testing showed that C.D. was in the low average range of general cognitive ability, average range for verbal comprehension and perceptual reasoning, average range of general processing speed, and low average range for general working memory.  (Tr. 380)

An Evaluation Team Report ("ETR") in May 2014, noted that last year C.D. inconsistently met expectations in working cooperatively with teachers and peers, communicating respectfully, demonstrating self-control, and listening and responding

appropriately. (Tr. 275) C.D.'s mother and teacher completed the Behavioral Evaluation Scale – 3 (BES-3). Both resulted in a standard score of 79, equivalent to the 8th percentile by grade. Both evaluations identified learning problems reflecting difficulties with concentration, disorganization, not completing tasks and responding impulsively. (Tr. 304) The evaluations reflected that C.D. responded with anger to perceived slights, made derogatory comments, and was unable to react appropriately to social cues. He blamed others for his mistakes, didn't obey teacher directives, acted impulsively without regard to the consequences for his behavior, and had extreme mood changes. (Tr. 304)

C.D. scored two standard deviations below the mean on the Learning Problems subscale, the Interpersonal Difficulties subscale, and the Inappropriate Behavior subscale. In the area of Learning, the primary behaviors of concern included: difficulty attending to academic tasks; failing classroom tests or quizzes; not grasping basic concepts; not following directions, written or verbal; requiring excessive assistance from others; difficulty organizing; refusing or failing to complete class assignments or homework; performing school work in a careless manner; responding too quickly and impulsively to questions about academic material; and demonstrating difficulty or reluctance to begin tasks. (Tr. 307)

In the area of Interpersonal Difficulties, C.D.'s primary behaviors of concern were: disrupting the work of others in class; trying to interact with other students but not being accepted by them because of his behavior; not recognizing or responding appropriately to nonverbal clues in social situations; seeming unable or unwilling to communicate feelings or emotions to others; responding inappropriately to constructive criticism or comments from others; avoiding interaction with other students or teachers; making derogatory comments or inappropriate gestures to other students or teachers or about other people. (Tr. 307)

In the area of Inappropriate Behaviors, the primary behaviors of concern were: demonstrating sudden or dramatic mood changes; blaming other persons or materials for his own failure or difficulty; not obeying teachers' directives or classroom rules; making inappropriate noises; failing to consider or disregarding consequences of his behavior; acting impulsively without self-control; exhibiting off-task behaviors; continuing to engage in a behavior when it is no longer appropriate; and talking at inappropriate times or making irrelevant comments. (Tr. 308)

Both the Teacher Report and the Child Behavior Checklist within the ETR noted that C.D. tended to externalize his emotions by attention-getting, rule-breaking, and aggressive behaviors. The report stated that C.D.'s impulsivity and mood fluctuations should be monitored. (Tr. 314)

Based on the report C.D.'s mother completed, his scores on the Anxiety Problems and Conduct Problem scales were in the clinical range (above the 97th percentile). His scores on the Affective Problems and Attention Deficit/Hyperactivity Problem scales were in the borderline range. (93rd to 97th percentile). (Tr. 316) C.D.'s teacher reported specific behavioral concerns of withdrawn or depressed behavior, problems in social relationships, thought problems, attention problems, rule-breaking behavior and problems of an aggressive nature. (Tr. 321)

Based on C.D.'s significant degrees of impulsivity, distractibility, and disorganization, the ETR team determined that C.D. demonstrated an impairment which adversely affected his educational performance and required specialized instruction. (Tr. 334)

C.D.'s IEP was continued in May 2015. (Tr. 393) C.D. had progressed over the year; his grades had improved greatly; and his reading and math assessment scores had increased. (Tr. 394) He also progressed in his ability to respond appropriately to peers and adults. (Tr. 396)

His on-task behavior improved.  He continued to struggle with reacting appropriately to adult redirection.  When he was redirected for minor behaviors, such as getting out of his seat, talking out of turn and not following directions, he responded by refusing to participate, yelling, or walking out of the room.  (Tr. 396)  His accommodations included small groups, extended time, and breaks.  (Tr. 401)

The May 2015 STAR Reading evaluations showed C.D.'s performance was below average at the 3.1 grade level.  (Tr. 418)  Results from the STAR Reading assessment from October 2015 showed C.D.'s performance was below average at the 3.6 grade level.  He scored in the 22nd percentile of students in the same grade.  He was at least 80% proficient at reading grade level words and books. (Tr. 430)

**B.      Medical Evidence**

In December 2013, Bellefaire JCB established a service plan for C.D. after his mother reported that he had difficulty expressing his emotions appropriately.  (Tr. 227-234)  The assessment noted problems at school related to interpersonal difficulties with peers; demonstrating verbal and behavioral outbursts in the classroom setting; and a negative self-perception.  His mother reported that he witnessed domestic violence when he was approximately three to four years old and that he displayed maladaptive skills for coping with stress and a heightened sense of paranoia.  (Tr. 227)  C.D. reported that he felt terrible about himself and lacked confidence in his abilities.  He would occasionally talk back to his teachers or crawl under his desk when he did not want to or believed he was incapable of doing the required activity.  (Tr. 232)  He reported thinking of self-harm in response to peers teasing him or when he became upset or felt that he had been wronged in some way.  (Tr. 234)

On March 7, 2014, C.D.'s mother took him to St. Luke's Pediatrics after he talked about

hurting himself.  (Tr. 482)  Treatment notes state that he was previously evaluated on February 25, 2014 for suicidal thoughts.  On examination, C.D. looked well and was in no acute distress. He was instructed to continue behavioral therapy and referred to psychological care.  (Tr. 483)

C.D. met with Deborah Koricke, Ph.D., on September 20, 2014, for a disability psychological evaluation to assess his mental status and level of intellectual functioning.  (Tr. 486-495)  C.D.'s mother reported significant behavioral issues at school including four suspensions in the last year.  She reported that he became angry and fought with students who were bullying and teasing him.  She reported that he would get mad and light matches or destroy toys.  He had also stolen items from stores and teachers.  She also reported significant difficulty with attention.  (Tr. 488)

During Dr. Koricke's examination, C.D. appeared active but was smiling and friendly. He was distracted but able to answer questions when prodded.  He spoke with 100% intelligibility and generally understood questions and answered in an age-appropriate manner when motivated.  (Tr. 489-490)  However, he responded with curt, undeveloped responses due to his distracted presentation at times.  C.D. was not anxious and denied worry, fears, phobias, nightmares, flashbacks, startle response, or panic attacks.  (Tr. 490)  C.D. denied symptoms of psychosis and was not suffering from hallucinations.  (Tr. 490)  C.D. was oriented on all spheres and there was no evidence of any diagnosable learning disorders.  His level of insight and judgment into his situation was limited for his age.  (Tr. 491)

C.D.'s daily activities included taking the bus to school, going to daycare after school, and socializing with a few friends.  He had trouble getting along with his peers due to his attitude and fighting.  He enjoyed science activities and playing outside with his five-year-old brother. (Tr. 491-492)

Dr. Koricke diagnosed ADHD and Occupational Defiance Disorder ("ODD"), moderate. C.D. was not currently taking any medication for his symptoms. (Tr. 492) In describing limitations related to self-care, Dr. Koricke stated:

> [h]e is independent in toileting and is able to sleep alone. He shows limited frustration tolerance and mother indicates that he is impulsive in his behavior. He will argue with others and will become oppositional and becoming [sic] very aggressive in interaction. In sum, the child is exhibiting significant limitation related to symptoms of ADHD and ODD.

(Tr. 494-495)

On September 23, 2014, Ohio Guidestone completed a Youth Mental Health Assessment of C.D. at the request of the school social worker. (Tr. 505-511) C.D. was well groomed, had average demeanor and eye contact, average activity, clear speech, no reported delusions or self-abuse, no reported hallucinations, full affect, cooperative behavior, average estimated intelligence, no risk of harm to self or others, and impaired concentration/attention, judgment, and insight. (Tr. 508-509) His severity of symptoms was noted as mild and his level of functioning impairment was moderate. (Tr. 509) He was diagnosed with ADHD, with disturbances in his emotional conduct both at home and at school. (Tr. 510) A treatment plan was developed to work on improving his impulse control. (Tr. 512) C.D. was given a prescription for Clonodine Hydrochloride. (Tr. 511)

C.D. returned to Ohio Guidestone in November 2014. He had a blunt affect and was quiet. He was serving a 10 day suspension from school for stealing candy from his teacher. (Tr. 518) On December 23, 2013, C.D. was evaluated by Nurse Practitioner, Lashelle Henderson. He presented with good mood and affect. C.D. was improving with medication. His mother denied any medication side effects and C.D. said he was "doing okay." (Tr. 523) C.D. had no abnormal psychotic thoughts, good judgment and insight, intact memory, normal

attention/concentration, and stable mood/affect. (Tr. 524-525)

C.D. presented to Ms. Henderson again on February 6, 2015. He was quiet with a flat effect. His mother reported that he had been acting up more in class and would not sit down. He stated that he had been "doing okay." C.D.'s mother requested a dosage increase of his medication because the school had been calling her again. (Tr. 562)

On March 27, 2015, C.D.'s mother reported to Ms. Henderson that C.D. had been doing well and was doing well in school. C.D. also reported "doing good." C.D.'s mother reported that his appetite was good and he was tolerating his medications well. (Tr. 567)

C.D. reported doing well on June 19, 2015. He had a good mood and affect. (Tr. 572) On August 20, 2015, C.D. presented to Ms. Henderson with a guarded mood and blunt affect; he was not engaged, failed to make eye contact, and just shrugged when responding to questions. C.D.'s mother reported that they were traveling back and forth from Columbus due to her sick newborn. C.D. was not doing well. That morning he became enraged and threw a plate at her. She swaddled him in a blanket and held him to calm him down. She also called the crisis line. C.D.'s medications were adjusted. (Tr. 577)

Treatment notes on August 26, 2015 from therapist, Jason Gooden, P.C., state that C.D. shut down when asked to talk about his feelings and had recently started talking about killing himself when he got upset. C.D. was diagnosed with PTSD and referred for ongoing counseling and case management services. (Tr. 665-666)

C.D. had a guarded mood and blunt affect at his next appointment on September 22, 2015. (Tr. 582) C.D.'s mother reported that he was more aggressive with his medications and had been suspended twice. He was not eating like he should and was skipping lunch at school. C.D. said he did not like his school anymore and had gotten into two fights. (Tr. 582) Ms.

Henderson adjusted C.D.'s medications again.  (Tr. 582)

In December 2015, C.D. was admitted to Windsor-Laurelwood Center for Behavioral Medicine for threatening suicide.  He reported being stressed by his sister's upcoming cardiac surgery and complained of auditory hallucinations.  He reported witnessing domestic violence between his mother and father.  He reported intrusive thoughts and avoidance.  (Tr. 672)  He was admitted for six days and diagnosed with major depressive disorder, recurrent, severe, with psychotic features; PTSD; and ADHD.  (Tr. 674)  C.D. was discharged and prescribed Celexa, Abilify, Adderall, Clonidine and Melatonin.  (Tr. 674)

Seven days after the hearing, C.D. was admitted to Windsor-Laurelwood Behavioral Medicine again with suicidal thoughts and a plan to hang himself.  (Tr. 762)  He reported increased stress at school and home, with nightmares, intrusive thoughts, anxiety, and avoidance.  (Tr. 760)  Mental status examination findings included no evidence of hallucinations, cooperative behavior with blunted, euthymic affect, good mood, no suicidal or homicidal ideation, adequate concentration and memory, and improved insight and judgment.  (Tr. 754-56, 758)  C.D. was discharged in satisfactory and improved condition on February 18, 2016 with diagnoses of major depressive disorder, severe; ADHD; and PTSD.  His prescriptions for Celexa and Abilify were increased.  (Tr. 763)

### C.    New Medical Evidence

Davis submitted new evidence for consideration after the ALJ issued his decision.  Two weeks after the ALJ decision, C.D. was admitted to the Behavioral Unit of Windsor-Laurelwood hospital for the third time in three months, from March 28th to April 4 2016 for increased aggressive behavior.

His mother reported that C.D. threatened harm to another child at school and chased his sister with a knife.  She reported that C.D. was compliant with his medications, but C.D. said he

had not been taking them. (Tr. 60) On admission, C.D. was uncooperative, yelling, and agitated, with an irritated and dysphoric mood. His grooming was poor, with variable eye contact and poor attention span and concentration. He threatened to bang his head on a chair. (Tr. 60) During his hospitalization, C.D. attended group therapy and individual sessions to learn new and positive coping skills. (Tr. 62) Upon discharge, C.D. was ordered to follow up with Dr. James at Ohio Guidestone and therapy with PEP Connection. (Tr. 62)

### D. Opinion Evidence

State agency reviewing physicians Irma Johnston, Psy.D. and John L. Mormol, M.D. reviewed C.D.'s records in October 2014. These physicians found that C.D. had the severe impairments of ADHD, ODD and asthma. (Tr. 102) They opined that these impairments did not meet or equal any of the listings of impairments. (Tr. 103) In the domains of acquiring and using information, attending and completing tasks and caring for self, the reviewing physicians opined that C.D's limitations were less than marked. In the domains of moving about and manipulating objects and health and physical well-being they opined that C.D. had no limitations. They opined that he had a marked limitation in the domain of interacting and relating with others. (Tr. 103-104)

On reconsideration, Paul Tangeman, Ph.D., and Uma Gupta, M.D., reached the same opinions as Drs. Johnston and Mormol. (Tr. 115-116)

### E. Hearing Testimony

C.D.'s mother, Malinda Davis, testified at the administrative hearing on February 3, 2016. (Tr. 80-93) C.D. was ten years old as of the hearing date. Davis testified that C.D. had migraines, asthma and anxiety and depression. (Tr. 82-82, 92) C.D. would often get frustrated

and would say or write that he wanted to kill himself.  (Tr. 90)  Medications helped but sometimes caused fatigue and, at other times, increased aggression.  (Tr. 82)

C.D. had an IEP at school.  He was getting an F in reading but average grades in other classes.  He was never held back in school but was suspended six times in approximately 18 months.  (Tr. 83)

C.D. did laundry for the entire family each week.  (Tr. 84-85, 87)  He also took out the trash.  (Tr. 85)  He enjoyed playing video games.  He could ride a bike, brush his teeth, shower and dress himself.  (Tr. 86-87)  Davis said that C.D. respected authority.  (Tr. 87)

## VI.   Law & Analysis

### A.   Standard of Review

The court's review is limited to determining whether substantial evidence in the record supported the ALJ's findings of fact and whether the ALJ correctly applied the appropriate legal standards.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");  *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error of law was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of*

*Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. Whether C.D.'s Limitations were Marked in the Domain of Self-Care

A child's disability is considered to functionally equal the disability Listings when he has a marked limitation in at least two out of six domains of functioning, or an extreme limitation in just one. 20 C.F.R. § 416.926a(a); *Elam ex rel. Golay v. Comm'r*, 348 F.3d 124, 127 (6th Cir. 2003). A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(a) & (e)(2). The ALJ found that C.D. had no extreme limitations and only one marked limitation (interacting and relating with others). (Tr. 27-28) Because only one marked limitation was found, C.D. did not functionally equal the disability Listings. Davis argues that C.D. also had a

marked limitation in the domain of caring for self.  The Commissioner counters that substantial

evidence supported the ALJ's finding that C.D. had less than marked limitations in this domain.

Because Davis only challenges the ALJ's findings on one of the six domains, it is unnecessary to

address the Commissioner's findings on the other five.

          **1.**        **Care for Self**

In this domain, the Commissioner considers how well the claimant maintains a healthy

emotional and physical state, including how well he gets his physical and emotional wants and

needs met in appropriate ways; how he copes with stress and changes in his environment; and

whether he takes care of his own health, possessions, and living area. 20 CFR § 416.926a(k).

The regulations generally describe "Caring for yourself" as follows:

> (i.)     Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety.  It is characterized by a sense of independence and competence.  The effort to become independent and competent should be observable throughout your childhood.

> (ii.)     Caring for yourself effectively means becoming increasingly independent in making and following your own decisions.  This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself.  As you mature, using and testing your own judgment helps you develop confidence in your independence and competence.  Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

> (iii.)     Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs.  To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions.  Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv.)  Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

20 CFR § 416.926a(k)(1)(i)-(iv).

School age children (age 6-12) should be striving to exhibit the following behaviors:

You should be independent in most day-to-day activities (e.g., [dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely.  You should begin to recognize that you are competent in doing some activities and that you have difficulty with others.  You should be able to identify those circumstances when you feel good about yourself and when you feel bad.  You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior.  You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you.  You should begin to imitate more of the behavior of adults you know.

20 CFR § 416.926a(k)(2)(iv).

The Regulations list examples of limited functioning in caring for yourself but qualify the list of examples by noting that "the examples do not necessarily describe a "marked" or "extreme" limitation."  Some examples of difficulty children could have in caring for themselves are:  (i) continues to place non-nutritive or inedible objects in the mouth (e.g., dirt, chalk); (ii) often uses self-soothing activities that are developmentally regressive (e.g., thumb-sucking or re-chewing food); (iii) does not feed, dress, toilet , or bathe self age-appropriately; (iv) engages in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take medication), or ignores safety rules; (v) does not spontaneously pursue enjoyable activities or interests (e.g., listening to music, reading a book); (vi) has restrictive or stereotyped mannerisms (e.g., head banging, body rocking); or (vii) has disturbances in eating or sleeping patterns.  20 CFR § 416.926a(k)(3).

The ALJ discussed these regulations in his opinion.  (Tr. 23-24)  His conclusion as to

C.D.'s limitations in this domain was as follows:

> The claimant has less than marked limitation in the ability to care for himself.
> The record does not suggest that the claimant's impairments impose any
> significant limitations on his ability to physically care for himself. Indeed, the
> claimant and his mother have acknowledged that the claimant engages in several
> activities that demonstrate his capability in this domain, including helping with
> household chores, doing laundry for his entire family by himself once per week,
> cleaning his room, taking out the trash, caring for his personal hygiene, riding the
> school bus, and riding a bicycle. However, this domain also considers a child's
> ability to self-regulate and engage in self-care in ways that are age-appropriate.
> As discussed above, the medical and education records establish that the claimant
> has experienced some difficulty managing his emotions and responding to stress
> in an appropriate manner. Notably though, the medical evidence also establishes
> that the claimant's difficulties in this area have improved with consistent
> treatment and appropriate medication adjustments. After reviewing the record,
> the State DDS consultants concluded that the claimant had less than marked
> limitations in this domain. The undersigned also finds that the claimant had less
> than marked limitations in his ability to care for himself.

(Tr. 31)

Davis points to her own opinion and the opinion expressed by C.D.'s teacher in the ETR

report; to treatment notes from mental health agencies; and to the opinion of Dr. Koricke, the

consultative examiner, to support her argument that C.D. had a marked limitation in the domain

of caring for self. Davis does not argue that there was no evidence to support the

Commissioner's finding. Rather, she argues that other evidence supported the conclusion she

thought the ALJ should have reached. But, "the Commissioner's findings are not subject to

reversal merely because substantial evidence exists in the record to support a different

conclusion. The substantial evidence standard presupposes that there is a "zone of choice"

within which the Commissioner may proceed without interference from the courts. If the

Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky*, 35 F.3d at 1035.

Here, the ALJ cited and relied on record evidence to support his finding in the domain of

caring for self.  He noted C.D. was able to physically care for himself and did chores around the house, including the laundry for his entire family.  The ALJ recognized C.D. had experienced difficulty in managing his emotions and responding to stress in appropriate ways.  However, the ALJ noted the record showed C.D. improvement with treatment and medication adjustments. The ALJ considered this evidence and determined that C.D.'s limitations in this domain were less than marked.  The ALJ relied on substantial evidence in making this finding.  The fact that other record evidence could have supported a different conclusion is not enough to warrant reversal on this basis.  Substantial evidence supported the ALJ's conclusion that C.D.'s limitation in the domain of self-care was less than marked.

## 2.     Opinion of Consultative Examiner Dr. Koricke

In reaching the conclusion that C.D.'s limitation in the domain of self-care was less than marked, the ALJ assigned limited weight to the opinion of Dr. Koricke, the consulting examiner. (Tr. 24)  Davis argues that the ALJ improperly discredited the opinion of Dr. Koricke.  The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In determining disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The Code of Federal Regulations describes how medical opinions must be weighed:

> (c)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. ...

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

. . .

20 CFR § 416.927(c).  See also 20 CFR § 404.1527(c).

Regarding, Dr. Koricke's opinion, the ALJ stated:

Following her September 2014 psychological consultative examination, Dr. Koricke opined that the claimant "can be expected to experience difficulty functioning on a daily basis due to significant attention deficits, increased behavioral levels, and oppositional and defiant attitudes and behaviors."  Dr. Koricke added that the claimant "likely has difficulty learning and retaining new information and in a group situation due to his ADHD (and) ODD symptoms, (and) he can be expected to require more redirection to sustain focus to the task and given small segments of information to be able to cognitively process and learn didactic information due to ADHD and ODD symptoms."  Dr. Koricke also stated that the claimant "can be expected to have difficulty sustaining attention for

long periods of time and will require redirection from adults in a group setting to complete assigned tasks." Dr. Koricke added that the claimant "will require higher level of supervision to complete tasks due to his poor sustained attention and impulsive behavior." Furthermore, Dr. Koricke noted that the claimant "shows limitations in his ability to interact due to poor attention and distractibility, as well as his continued oppositional and defiant attitudes and behaviors." (Ex. 5F)

The undersigned gives limited weight to Dr. Koricke's opinion because it is inconsistent with the medical evidence and the record as a whole, including the claimant's subsequent improvement with consistent treatment and medication usage, the mental status examination findings of the claimant's treating providers, and the claimant's reported activities of daily living. Indeed, Dr. Koricke provided this opinion after a single evaluation of the claimant during a period when the claimant had not yet started taking medications to address his mental impairments. Additionally, it appears that Dr. Koricke may have relied quite heavily on the claimant's mother's subjective report of symptoms and limitations, and that she may have actually accepted as true most, if not all, of what the claimant's mother reported. Yet, as explained above, there exist good reasons for questioning the reliability of the claimant's mother's subjective allegations regarding the claimant's impairments.

(Tr. 23-24)

Davis contends the ALJ summarily found that Dr. Koricke's opinion was inconsistent with other evidence, including C.D.'s subsequent improvement. Davis also argues that the ALJ improperly questioned whether Dr. Koricke heavily relied on Davis's subjective reports regarding C.D. ECF Doc. 16, Page ID# 843-844.

Dr. Koricke only saw C.D. once, on September 20, 2014. Dr. Koricke did not have an ongoing relationship with C.D., and Davis was the primary source of information for the Disability Assessment Report. Throughout the report, Dr. Koricke notes that the information was reported by Davis. (Tr. 487, 488, 489, 491, 492, 495) In the area of self-care, Dr. Koricke also indicated that the information on which she relied was from C.D.'s mother

[C.D.] can complete self-care activities with structure and reminders from mother. He often requires redirection when he gets off-task doing chores, and also refuses to help out. He is independent in toileting and is able to sleep alone. He shows limited frustration and *mother indicates* that he is impulsive and oppositional in

his behavior.  He will argue with others and will become oppositional and
becoming [sic] very aggressive in interactions.  In sum, the child is exhibiting
significant limitation related to symptoms of ADHD and ODD.

(Tr. 495) (emphasis added)  The information contained in Dr. Koricke's assessment of C.D.'s

self-care is clearly based on reports from Davis.   Dr. Koricke observed C.D. for only a short

time and relied on the reports from Davis in evaluating C.D.'s self-care.  Moreover, Dr. Koricke

did not specifically opine that C.D. had a marked limitation in the area of self-care.  She stated

that he would have limitations related to his symptoms of ADHD or ODD.  It is not even clear

how these "limitations" relate to the domain of self-care.

Dr. Koricke was not a treating physician.  The ALJ was not required to assign *controlling*

weight to her opinion or even to provide good reasons for failing to do so.  *See Smith v. Comm'r,*

482 F.3d 873, 876 (6th Cir. 2007).  Nor was the ALJ required to incorporate all of Dr. Koricke's

findings into his decision.  Rather, he was required to evaluate several factors in assessing C.D.'s

limitations including the evidence (not limited to medical opinion testimony), and the claimant's

testimony.  *Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS  18644, *6-7 (N. D. Ohio, October 13,

2009) citing, *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5p, 1996

SSR LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5.  The ALJ properly discounted Dr. Koricke's

opinion because she met with C.D. once; formed her opinions before he began treatment and

medications; and because her opinion relied heavily on Davis's subjective reports.  The ALJ was

not required to provide good reasons for assigning limited weight to her opinion but he did – and

his reasoning is supported by substantial evidence in the record.

### 3.    State Agency Reviewing Physicians

Davis also contends that the ALJ erred in relying on the state agency reviewing

physicians who reviewed C.D.'s records before he underwent several psychological assessments

and was admitted on two occasions for suicidal thoughts. ECF Doc. 16, Page ID# 846. Pursuant to the regulations, an ALJ must consider such opinions, along with the opinions of the other medical sources of record:

> 2) Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows:

> (i.) Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled (see § 404.1512(b)(8)).

> * * *

> Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2) (emphasis added).

The ALJ did not err in ascribing great weight to the opinions of the state agency physicians in this case. There was no opinion from a treating physician and the ALJ explained the weight given to each medical opinion. Further, the state agency physicians' opinions constituted substantial evidence capable of supporting the ALJ's decision as to C.D.'s limitations in the domain of self-care. *See, e.g., Filus v. Astrue*, 694 F.3d 863 (7th Cir. 2012) (finding that

state agency physicians' opinions that a claimant did not meet or medically equal any listed impairment constituted substantial evidence supporting the ALJ's conclusion); *Cantrell v. Astrue,* 2012 U.S. Dist. LEXIS 182688, 2012 WL 6725877 at *7 (E.D. Tenn. Nov. 5, 2012) (finding that the state agency physicians' reports provided substantial evidence to support the ALJ's RFC finding); *Brock v. Astrue*, 2009 U.S. Dist. LEXIS 42753, 2009 WL 1067313 at *6 (E.D. Ky. Apr. 17, 2009) ("[T]he argument that the findings of the two non-examining state agency physicians cannot constitute substantial evidence is inconsistent with the regulatory framework."); *Clark v. Astrue*, 2011 U.S. Dist. LEXIS 100778, 2011 WL 4000872 (N.D.Tex. Sept.8, 2011) (state agency expert medical opinions "constitute substantial evidence to support the finding that plaintiff can perform a limited range of light work."); *See also, Maust v. Colvin,* 2014 U.S. Dist. LEXIS 137635, *15-17 (N.D. Ohio September 29, 2014). The court agrees with these statements, particularly when a plaintiff can offer no treating source opinion that conflicts with the assessments of the state agency reviewing physicians.[3]

Davis further contends that the ALJ should not have relied on the state agency physician's opinions in this case because they did not review C.D.'s entire record. ECF Doc. 16, Page ID# 846. Davis has not cited any case law supporting this argument and "[t]here is no regulation or case law that requires the [ALJ] to reject an opinion simply because medical evidence is produced after the opinion is formed." *Mount v. Comm'r,* 2013 U.S. Dist. LEXIS 83358 at *29 (S.D. Ohio June 13, 2013); *Williamson v. Comm'r of Soc. Sec*., 2013 U.S. Dist. LEXIS 10706 at *7 (S.D. Ohio Jan. 9, 2013). The ALJ reviewed the additional records

---

[3] Davis implicitly argues that the consulting physician's (Dr. Koricke's) opinion conflicts with the opinions expressed by the State agency reviewers. As noted above, however, it is not clear whether Dr. Koricke actually opined that C.D. had a marked limitation in the domain of self-care. Moreover, as pointed out by the ALJ, Dr. Koricke only met C.D. on one occasion, before he began treatment, and relied, in large part, on Davis's subjective reports.

submitted by Davis before he rendered his decision and determined that C.D. was not disabled. The ALJ did not violate any legal standards by assigning great weight to the opinions expressed by the State agency reviewing physicians in this case.

### C.    Sentence Six Remand

Finally, Davis requests that the court remand this case so that the Commissioner can consider new evidence. Sentence 6 of 42 USC § 405(g) permits a district court, under certain circumstances, to remand a case for further proceedings in light of new and material evidence. *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir.) Davis bears the burden of demonstrating that the additional evidence is both "new" and "material" and that there is "good cause" for the failure to present the evidence to the ALJ. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 483 (6th Cir. 2006). Evidence is "new," for purposes of this provision, only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990). Additional evidence is material only if it concerns the plaintiff's condition prior to the ALJ's hearing decision and if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with new evidence." *Oliver v. Sec'y of HHS*, 804 F.2d 964, 966 (6th Cir. 1986); *Sizemore v. Sec'y of Health and Human Servs.,* 865 F.2d 709, 711 (6th Cir. 1988).

Davis has submitted evidence of a seven-day hospitalization of C.D. two weeks after the ALJ issued his decision. She contends that this evidence relates to C.D.'s condition prior to the ALJ's decision and further demonstrates that C.D. had a marked limitation in the domain of caring for self. ECF Doc. 16, Page ID# 847-849. She argues that the evidence is material because it shows, despite medication and treatments, C.D.'s condition was not improving, as the ALJ had found.

The evidence submitted by Davis is new because it did not exist when the ALJ heard this claim. *Sullivan,* 496 U.S. at 626. However, it is questionable whether the evidence truly relates to C.D.'s condition before the hearing. Normally, the court refuses "to consider evidence submitted after the ALJ issued his decision when reviewing that decision for substantial evidence under 42 U.S.C. § 405(g)." *See Curler v. Comm'r of Soc. Sec.,* 561 F. App'x. 464, 472-473 (6th Cir. 2014), citing *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148 (6th Cir. 1996). If the claimant believes that his condition has deteriorated after the date of the ALJ's decision, and that he now meets the requirements of disability as set forth in the Social Security Act, he is required to file a new application for benefits. 20 C.F.R. § 404.620(a)(2).

It is also questionable whether the new evidence would have affected the Commissioner's disposition of C.D.'s disability claim had the new evidence been presented. The Commissioner was aware that C.D. has been admitted to the Windsor-Laurelwood Center in December 2015 and in February 2016. (Tr. 22) When C.D. was admitted again on March 28, 2016, after the ALJ issued his decision, C.D. told hospital personnel that he had had not been taking his medications. (Tr. 60) Records from this admission show that, by the time of discharge and recommencement of medication on March 30th, C.D. was more cooperative and able to talk about ongoing stressors. He improved quickly and was discharged with the diagnoses of major depressive disorder, PTSD, ODD, and ADHD (none of which were new diagnoses.) (Tr. 64) Considering that C.D. admitted he had not been taking his medications; that he improved quickly after his medications were monitored at the facility; and that he did not have any new diagnoses upon discharge, the court finds that Davis has not met her burden of showing that the new submitted evidence was material to C.D.'s condition prior to the issuance of the ALJ's decision.

Because the evidence is not material to Davis's current application on behalf of C.D., remand is not warranted on that basis.

## VII.  Conclusion

Because substantial evidence supported the ALJ's decision and he applied the correct legal standards, the final decision of the Commissioner is AFFIRMED.  Plaintiff's request for remand is DENIED.  Plaintiff failed to show that evidence of additional treatment after the ALJ issued his decision was material to the decision.

**IT IS SO ORDERED.**

Dated: June 15, 2018

Thomas M. Parker
United States Magistrate Judge